# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

_____

| | | |
|---|---|---|
| In re: TRANSPERFECT GLOBAL, INC. | ) | C.A. No. 9700-CB |
| _____ | ) | |
| | ) | |
| ELIZABETH ELTING, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 10449-CB |
| | ) | |
| PHILIP R. SHAWE and SHIRLEY SHAWE, | ) | |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRANSPERFECT GLOBAL, INC. | ) | |
| Nominal Party. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Date Submitted:  January 30, 2018
Date Decided:  February 15, 2018

Kevin R. Shannon, Berton W. Ashman, Jr., Christopher N. Kelly, Jaclyn C. Levy, and Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philip S. Kaufman, Ronald S. Greenberg, Marjorie E. Sheldon, and Jared I. Heller, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; *Attorneys for Elizabeth Elting.*

David L. Finger, FINGER & SLANINA LLC, Wilmington, Delaware; Peter B. Ladig and Brett M. McCartney, BAYARD, P.A., Wilmington, Delaware; David B. Goldstein, RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN, P.C., New York, New York; *Attorneys for Philip R. Shawe.*

Jeremy D. Eicher, EICHER LAW LLC, Wilmington, Delaware; *Attorney for Shirley Shawe.*

Jennifer C. Voss and Elisa M.C. Klein, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Custodian Robert B. Pincus*.


**BOUCHARD, C.**

In this decision, the court accepts the recommendation of the court-appointed Custodian to approve a transaction in which one of the co-founders of TransPerfect Global, Inc. (Philip Shawe) will acquire the shares held by the other co-founder (Elizabeth Elting) to finally resolve this litigation. I begin with a summary.

After forming what became TransPerfect over twenty years ago, Elting and Shawe served as co-CEOs and the only two directors of the Company as it became highly profitable. Over time, however, their relationship and management of the Company devolved into a state of complete dysfunction, as manifested by irretrievable deadlocks at both the board and stockholder levels. This situation prompted Elting to file suit under 8 *Del. C.* § 226 to sell the Company in order to implement, in effect, a business divorce.

On August 13, 2015, the court issued a post-trial decision granting Elting the relief she requested and appointing a Custodian to sell the Company. The Custodian was given a dual mandate: "to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders."[1]

On July 18, 2016, after further proceedings to flesh out how the sale process would work, the court entered an order adopting the Custodian's recommendation to conduct a "modified auction" in which Elting and Shawe could solicit investors

---

[1] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *32 (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

1

to partner with them to acquire the Company and the Custodian could solicit bids from third parties (the "Sale Order"). Elting fully supported all of the terms of the Sale Order, which expressly provides that the Custodian's decisions, including his selection of the winning bidder, are governed by an abuse of discretion standard. Shawe was irretrievably opposed to the Sale Order and commenced an aggressive campaign of collateral litigation, the targets of which included Elting, her husband, her advisors, and the Custodian, among others.

On February 13, 2017, the Delaware Supreme Court affirmed this court's August 2015 opinion and the Sale Order. Commenting on the dual mandate underlying the Sale Order, the Supreme Court explained that "[b]y preserving the Company as a whole," the remedy "was well designed to protect the other constituencies of the Company—notably its employees—by positioning the Company to succeed and thus to secure the jobs of its workforce."[2]

From March to November 2017, the Custodian, with the assistance of a number of advisors, conducted an extensive sale process. Approximately 97 financial and strategic firms were solicited to participate, 65 of which entered into confidentiality agreements. After three formal rounds of bidding and an informal fourth round to elicit "final" bids, two leading bidders emerged: Shawe and H.I.G. Middle Market, LLC, the owner of TransPerfect's leading competitor. Between the

---

[2] *Shawe v. Elting*, 157 A.3d at 167.

two, the Custodian believed that Shawe ultimately would offer greater consideration than H.I.G. with fewer closing conditions and better terms (*e.g.*, indemnification and releases), while retaining virtually all of the Company's employees—a particularly important consideration given the Custodian's dual mandate. Thus, despite Shawe's vigorous opposition to the sale process, the Custodian reached out to negotiate with him in an effort to finalize a transaction.

On November 19, 2017, the Custodian executed a securities purchase agreement and certain ancillary agreements that call for an entity owned by Shawe to purchase Elting's shares of the Company in a transaction that will yield Elting approximately $287.2 million in net proceeds after tax (the "Sale Agreement"). According to the Custodian, the aggregate implied enterprise value of the transaction represents over ten times the Company's adjusted EBITDA for the twelve-month period ending September 30, 2017, and provides $20 million more in aggregate net proceeds after tax than H.I.G.'s prior offer. The Sale Agreement contains an exclusivity provision with no fiduciary out that is substantively identical to one that was included in a draft sale agreement circulated to H.I.G. and other bidders before the third round of the sale process, and to which H.I.G. expressed no opposition.

On November 22, 2017, after the auction had ended and despite the exclusivity provision in the Sale Agreement, H.I.G. submitted an unsolicited bid that would provide approximately $7.5 million of additional after-tax net proceeds to

3

Elting. Soon thereafter, Elting objected to the Custodian's recommendation that the court approve the Sale Agreement. She asks the Court to reject the Sale Agreement and to direct the Custodian to negotiate a transaction with H.I.G.

In support of this request, Elting asserts essentially five objections that, in one form or another, second-guess various judgments the Custodian made during the sale process. Specifically, Elting asserts that the Custodian exercised poor judgment by (i) failing to seek relief from the court to address misconduct by Shawe that allegedly undermined the sale process, (ii) deciding to focus on negotiating with Shawe instead of H.I.G. at the end of the process, (iii) making certain adjustments in valuing H.I.G.'s bids relating to the litigation risk posed by Shawe, (iv) failing to include a fiduciary out in the Sale Agreement, and (v) agreeing to releases that, among other things, would bar Elting from asserting claims against Shawe regarding his alleged misconduct during the sale process.

Despite advocating for the abuse of discretion standard in the Sale Order, Elting now argues that the court should apply an entire fairness standard in considering the Custodian's recommendation. The theory for this reversal of position is that the Custodian was conflicted when he entered into the Sale Agreement because Shawe had sued him and attacked him in the media.

For the reasons detailed below, I conclude that the independence of the Custodian, for whom the Sale Order provides judicial immunity and robust

4

indemnification and advancement rights, has not been compromised in any way that would warrant deviating from the abuse of discretion standard in the Sale Order. Applying that standard, I further conclude that each of Elting's objections is without merit and accept the Custodian's recommendation to approve the Sale Agreement.

In reaching these conclusions, I note the irony of Elting's opposition to the court approving the outcome of an auction she sought in the first place. The undercurrent of her opposition reflects an apparent, deep-seated frustration with the fact that the winner of the auction was Shawe—who Elting has battled for years and who seems to engage in litigation as a way of life. But Shawe also is the person Elting chose to go into business with when she formed the Company and, as much as Elting might wish it were otherwise, Shawe was a core part of TransPerfect's operative reality when Elting asked that the Company be sold. Beyond that, Elting never sought relief from the court for conduct she claims after-the-fact to have undermined the sale process and, despite proclaiming a desire to acquire the Company herself, Elting never put together a bid approaching what Shawe was willing to pay for the Company. Elting forged her own path.

No sale process is perfect, and this one certainly presented challenges. Nonetheless, in my judgment, the Custodian deftly and firmly handled a challenging assignment to create a competitive dynamic that maximized the value of Elting's shares while simultaneously preserving the Company as a going concern to the

5

fullest extent possible, consistent with his dual mandate. With that result having been achieved, the court's fervent hope is that Elting will accept the result of the business divorce she sought almost four years ago, and that the litigation this dispute has spawned will come to an end so that all concerned can move on with their lives.

## I. BACKGROUND[3]

The factual background and procedural history of this extensive litigation are discussed in detail in earlier opinions of the Delaware Supreme Court and this court.[4] The court assumes the reader's familiarity with those opinions and recites below only those facts directly relevant to the court's consideration of the Custodian's recommendation that the court approve the Sale Agreement in accordance with Section 18(a) of the Sale Order.

### A. Events Leading up to Entry of the Sale Order

On August 13, 2015, for the reasons explained in a post-trial memorandum opinion of the same date, the court appointed Robert B. Pincus, Esquire as the

---

[3] TransPerfect Global, Inc. is referred to herein interchangeably as "TransPerfect," the "Company," or "TPG." At the relevant times, the Company's shares were held by Elting (50%), Shawe (49%), and Shawe's mother (1%), who is firmly aligned with her son. Unless noted otherwise, the docket numbers cited herein refer to the docket entries in C.A. 9700-CB.

[4] *See In re TransPerfect Glob., Inc.*, 2017 WL 3499921 (Del. Ch. Aug. 4, 2017); *In re Shawe & Elting LLC*, 2016 WL 3951339 (Del. Ch. July 20, 2016), *aff'd sub nom Shawe v. Elting*, 157 A.3d 142 (Del. 2017); *In re TransPerfect Glob., Inc.*, 2016 WL 3477217 (Del. Ch. June 20, 2016) *as revised* (June 21, 2016); *Shawe v. Elting*, 2015 WL 5167835 (Del. Ch. Sept. 2, 2015); *Shawe & Elting LLC*, 2015 WL 4874733.

Custodian to oversee a judicially ordered sale of the Company and to serve as a third director of the Company in the interim.[5] In doing so, the court rejected as "unduly punitive" Elting's request for "entry of an order that would preclude Shawe from bidding to acquire the Company, impose on him a non-competition agreement if the Company were sold to someone else, or afford Elting matching rights."[6]

As explained in the August 2015 opinion, the dual mandate of the judicially-ordered sale process was "to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders."[7] The opinion directed the Custodian to recommend to the court a proposed plan of sale with this dual mandate in mind and to:

> . . . evaluate the viability and the pros and cons of conducting a sale of the Company (a) in which the bidders would be limited to Shawe and Elting (individually or as part of a group), such as in a "Texas shoot out" or some other auction format, (b) in an open auction process that would include any interested bidders, or (c) in any other format the Custodian deems practicable in the circumstances of this case, which could include conducting a public offering to afford stockholders liquidity or dividing the operating assets of the Company along the production divisions that Shawe and Elting have separately managed.[8]

After his appointment, the Custodian engaged several advisors to assist in the performance of his duties, including Houlihan Lokey Capital Inc., which assisted in

---

[5] *Shawe & Elting LLC*, 2015 WL 4874733, at *32.

[6] *Id.*

[7] *Id.*

[8] *Id.*

identifying and analyzing certain sale alternatives, and Alvarez & Marsal, a management advisory group, which provided financial and operational services to the Company. Joel Mostrom, an employee of Alvarez & Marsal, came to serve as the Company's Corporate Development Officer. The Custodian also engaged Grant Thornton LLP to perform an audit assessment and to audit consolidated financial statements for the Company.

On February 8, 2016, the Custodian submitted a proposed plan of sale for the Company ("Sale Report") in which he identified five alternatives that he had evaluated:

1. *Division of Business.* A division of the Company into distinct business units, with those units to be divided between the two stockholders in an appropriate manner.

2. *Initial Public Offering.* An initial public offering of TPG's stock to provide a liquid market for the sale of shares by current stockholders at the time of the IPO and over time.

3. *Sale to Existing Stockholder.* The purchase by one stockholder of the other stockholder's shares in one of the formats detailed in [Houlihan Lokey's report].

4. *Broad Auction.* A customary broad auction process involving potential bidders comprised of strategic bidders, as well as financial bidders, such as private equity funds.

5. *Modified Broad Auction Led by Existing Stockholders.* A modified auction where each stockholder could solicit third-party investors as partners in an acquisition of TPG, and where the Custodian could work with outside bidders who are interested in purchasing TPG, but not

8

necessarily interested in partnering with an existing stockholder in connection with any acquisition.[9]

The Custodian concluded that, absent a consensual resolution, "the alternative most likely to maximize stockholder value while continuing the business as a going concern (and which can be accomplished in a reasonable time frame)" was the fifth alternative, namely the "Modified Auction."[10] The Sale Report explained that the Modified Auction had "the benefit of permitting each stockholder to bid for control of the Company (alone or in partnership with a third party), as well as permitting third parties (unaffiliated with the stockholders) to bid for the Company."[11]

The Sale Report further explained that "[i]n order to fulfill the Court's directive of running the sale process," the Custodian "would need maximum flexibility without interference from the stockholders, who may stand on both sides of a transaction."[12] To that end, the Custodian requested entry of a sale order implementing the Modified Auction that would authorize the Custodian, in his discretion, to expand "each selling stockholder's existing non-compete and non-solicit arrangements, to include the entirety of TPG and its subsidiaries."[13]

---

[9] Dkt. 735 at 5-6.

[10] Dkt. 735 at 7.

[11] Dkt. 735 at 7.

[12] Dkt. 735 at 10.

[13] Dkt. 735 at 10-11.

The court afforded the parties the opportunity to submit objections to the Sale Report and held a hearing to consider any objections. Shawe submitted a lengthy objection to the Sale Report, which boiled down to two key points. First, Shawe disagreed with the Custodian's recommendation to pursue a Modified Auction that would permit third parties to participate in the sale process from the outset. Shawe argued that the bidders should be limited, at least in the first instance, to Elting and himself.[14] Second, Shawe opposed the Custodian's request to authorize the Custodian to impose non-compete or non-solicitation obligations on a selling stockholder. Shawe contended that he and Elting were not contractually restricted in their ability to compete with the Company after leaving its employ, and that the sale process should reflect that operative reality.[15]

Elting did not object to any aspect of the Sale Report and requested that the court adopt the Custodian's recommendation. In response to Shawe's argument that the Custodian's request for "complete power over the sale process" sought "an over-broad and untethered delegation of authority,"[16] Elting cited two recent orders of this

---

[14] *TransPerfect Glob., Inc.*, 2016 WL 3477217, at *3.

[15] *Id.*

[16] Dkt. 778 at 5, 16.

court in making the point that custodians in other cases "have been granted precisely the same type of authority and discretion the Custodian requests here."[17]

On June 20, 2016, the court issued a decision in which it accepted the Custodian's recommendation to proceed with the Modified Auction with certain modifications.[18] Although the court seriously considered limiting the bidders in the sale process to Shawe and Elting (individually or as part of a group) given their functional 50-50 ownership of the Company since its inception,[19] the court was persuaded by the Custodian's well-reasoned recommendation to proceed with the Modified Auction in order to maximize stockholder value, one of the objectives of the dual mandate.

The court agreed with Shawe, however, that it would be inappropriate to authorize the Custodian to impose non-compete or non-solicitation obligations on a selling stockholder. It stood to reason that the Company would be worth more to a buyer if Shawe and Elting were subject to post-employment restrictions on their ability to compete or to solicit customers and employees than it would be without those protections. But, as the court explained, "the purpose of the sale process is to

---

[17] Dkt. 799 at 15-17 (citing *In re Supreme Oil Co., Inc.*, 2015 WL 2455952 (Del. Ch. May 22, 2015) (ORDER); *In re Carlisle Etcetera LLC*, 2015 WL 10371435 (Del. Ch. May 4, 2015) (ORDER)).

[18] *TransPerfect Glob., Inc.*, 2016 WL 3477217, at *1.

[19] *Shawe & Elting LLC*, 2015 WL 4874733, at *2.

11

maximize the value of the Company *as it is* and not to derive a hypothetically higher value based on contractual protections the Company may not currently possess."[20] The court nonetheless made clear that "the Custodian or any party may seek the implementation of non-competition or non-solicitation restrictions in the future upon a showing of good cause to address wrongful conduct in the sale process."[21]

## B.    The Sale Order

On July 1, 2016, the Custodian filed a proposed order to implement the court's rulings concerning the sale process.[22]    The parties again were afforded the opportunity to submit objections.[23]  Shawe submitted numerous objections.[24]  Elting requested entry of the Custodian's proposed form of order as is.[25]

On July 18, 2016, the court issued a letter decision rejecting Shawe's objections and entered an order in the form the Custodian submitted.[26]  The Sale Order recites the dual mandate of "maintaining the business as a going concern and maximizing value for the stockholders,"[27] and affords the Custodian "full and

---

[20] *TransPerfect Glob., Inc.*, 2016 WL 3477217, at *4.

[21] *Id.*

[22] Dkt. 833.

[23] Dkt. 834.

[24] Dkt. 837.

[25] Dkt. 840.

[26] Dkt. 848, 849.

[27] Dkt. 848 at 2.

exclusive authority" to conduct all aspects of the sale process.[28] It also affords the Custodian the "full and exclusive authority to determine the winning bidder of the Modified Auction" and enumerates various factors—including non-economic terms—that the Custodian may take into account in making such determination:

> Any offers from stockholders, as well as any offers from third-party bidders, made pursuant to the established procedures and processes, shall be evaluated by the Custodian, taking into account, among other considerations, price, non-economic terms, generally anticipated U.S. federal income tax consequences to the stockholders from the sale of the Company, likelihood of consummation and other reasonable factors. [29]

Paragraph 9 of the Sale Order further provides that the Custodian is authorized to execute and deliver a binding agreement on behalf of any of the stockholders (Elting, Shawe, or Ms. Shawe) in order to effectuate a transaction with the winning bidder:

> The Custodian is authorized to execute and deliver (or cause to be executed and delivered) on behalf of the Company and its stockholders (i) a definitive sale agreement, a merger agreement, a stock purchase agreement or any other form of similar agreement, with such provisions as the Custodian, in his sole discretion, deems necessary or appropriate and reasonably customary given the circumstances of this transaction, including, without limitation, representations and warranties, covenants, provisions relating to indemnification, termination fees or confidentiality, waiver of claim provisions, and other provisions that are reasonably customary given the circumstances of this transaction (a "Definitive Sale Agreement").[30]

---

[28] Dkt. 848 ¶¶ 1-2.

[29] Dkt. 848 ¶ 3.

[30] Dkt. 848 ¶ 9.

13

In accordance with the court's June 20, 2016 decision, the Sale Order provides that the Custodian *or the parties* can petition the court to impose sanctions, including the imposition of post-employment non-competition restrictions, if a stockholder takes action to impede the sale process or fails to comply with the Sale Order:

> The Custodian *or any party to the Actions* may petition the Court to impose sanctions on any director, officer, stockholder, employee or consultant of the Company who (i) fails to cooperate fully with the Custodian in connection with the performance of his duties under the Order, (ii) takes or fails to take any action which impedes or undermines, or intends to impede or undermine, the sale process or (iii) otherwise fails to comply fully with the Order.

> \* \* \* \* \*

> The Custodian *or any party to the Actions* may petition the Court and seek, upon a showing of good cause, the implementation of post-employment restrictions (among other appropriate relief) on any of Ms. Elting, Mr. Shawe or Ms. Shawe, including, without limitation, non-competition and non-solicitation restrictions if Ms. Elting, Mr. Shawe or Ms. Shawe (i) fails to cooperate fully with the Custodian in connection with the performance of his duties under the Order, (ii) takes or fails to take any action which impedes or undermines, or intends to impede or undermine, the sale process or (iii) otherwise fails to comply fully with the Order.[31]

The Sale Order makes clear that "[a]ll interim actions, recommendations and decisions of the Custodian (taken prior to the consummation of the Sale Transaction) shall be subject to review and reversal by the Court only upon a showing by a party

---

[31] Dkt. 848 ¶¶ 12-13 (emphasis added).

14

to the Actions that the Custodian abused his discretion."[32] It further provides the Custodian and his law firm (Skadden, Arps, Slate, Meagher & Flom LLP) with a series of robust rights to protect against any attempt to second-guess or intimidate the Custodian, including judicial immunity, indemnification, and advancement:

> The Custodian, the Firm, and the Firm's partners and employees (together with the Firm, "Skadden") are entitled to judicial immunity and to be indemnified by the Company (or its successor in interest), in each case, to the fullest extent permitted by law. Without limiting the generality of the foregoing, fees and expenses incurred by the Custodian or Skadden in defending or prosecuting any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under the Order shall be paid by the Company (or its successor in interest) in advance of the final disposition of such claim, action, suit or proceeding within 15 days of receipt of a statement therefor.[33]

Finally, the Sale Order provides that "[t]he consummation of the transactions contemplated by the Definitive Sale Agreement shall be expressly conditioned upon and subject to the approval of the Court."[34] It further specifies that the court "shall approve the Agreements, and the consummation of the transactions contemplated therein . . . unless the objecting party shows an abuse of discretion by the Custodian in connection with the sale process or the terms of the Agreements."[35]

---

[32] Dkt. 848 ¶ 15.

[33] Dkt. 848 ¶ 16.

[34] Dkt. 848 ¶ 18(a).

[35] Dkt. 848 ¶ 18(d).

## C. The Supreme Court's Affirmance

On February 13, 2017, the Delaware Supreme Court affirmed this court's August 2015 opinion and the Sale Order. In its affirming opinion, the Supreme Court explained that "[b]y preserving the Company as a whole," the remedy "was well designed to protect the other constituencies of the Company—notably its employees—by positioning the company to succeed and thus to secure the jobs of its workforce."[36] On May 16, 2017, Shawe filed a petition for a writ of certiorari in the United States Supreme Court, which was denied on October 2, 2017.

Also on February 13, 2017, the Delaware Supreme Court affirmed this court's separate decision to sanction Shawe for $7,103,755 in attorneys' fees and expenses "based on a clear record of egregious misconduct and repeated falsehoods during the litigation."[37]

On February 21, 2017, in response to the Delaware Supreme Court's affirmances, Elting stated in an email to the Company's employees, "I couldn't be more thrilled. The decisions grant everything I've requested over the last three years. More importantly, they are the best possible outcome for TransPerfect and our fabulous employees."[38]

---

[36] *Shawe v. Elting*, 157 A.3d at 167.

[37] *Shawe v. Elting*, 157 A.3d at 152.

[38] Dkt. 1227 (Ex. 1 at 1).

16

**D.     Pre-Sale Phase with the Co-Founders**

The Custodian retained Credit Suisse Securities (USA) LLC as his exclusive financial advisor for undertaking the sale process. He also selected Ernst & Young LLP to prepare a number of reports, including a quality of earnings report, an IT report, a market study, and a tax factbook with respect to the Company and its subsidiaries.

From March to April 2017, the Custodian, with Credit Suisse's assistance, engaged exclusively with Shawe and Elting, giving them the opportunity to comment on the proposed process and to submit the names of up to ten third parties interested in participating in the sale process.[39] Elting and Shawe provided the names of various third parties to Credit Suisse. The Custodian and his legal advisors negotiated and executed a number of confidentiality agreements to enable Elting and Shawe to engage with those third parties.[40] At the end of this process, Shawe and Elting informed the Custodian and Credit Suisse that they intended to participate in the auction as potential buyers.[41]

---

[39] Dkt. 1185 (Pincus Ltr. Annex A at 4).

[40] *Id.*

[41] *Id.*

17

## E. Initial Contacts with Potential Participants

In May 2017, Credit Suisse proposed a list of 92 potential participants for the sale process.[42] On and after May 22, 2017, Credit Suisse distributed a summary highlighting the Company's business and certain key financial information and a confidentiality agreement to approximately 97 potential participants, which included approximately 90 financial participants and seven strategic participants.[43] Between May 22 and September 7, 2017, Credit Suisse was contacted by an additional five interested participants and sent them the summary and a confidentiality agreement.[44]

From May through July 2017, the Custodian's legal advisors negotiated and executed approximately 65 confidentiality agreements.[45] Previously, the Company had entered into confidentiality agreements with Elting and approximately seven additional parties seeking to partner with her to acquire the Company. Credit Suisse provided an information package to each participant who entered into a confidentiality agreement.[46] Potential bidders also were provided access to a market

---

[42] *Id.*

[43] *Id.* at 4-5.

[44] *Id.* at 5.

[45] *Id.*

[46] *Id.* The package included (i) a confidential information presentation with detailed financial and business information regarding the Company, (ii) the Company's 2014 and 2015 audited financial statements, (iii) the Company's 2016 draft unaudited financial statements, and (iv) a litigation summary memorandum.

18

study Ernst & Young had prepared.[47] After the distribution of these materials, bidders performed due diligence related to the Company, and Credit Suisse responded to inquiries from interested participants about the Company.[48]

On June 20, 2017, Credit Suisse sent a process letter to approximately 69 participants inviting each party to submit a preliminary non-binding indication of interest for the acquisition of the Company.[49] This process letter requested that initial proposals and certain other information be submitted by July 13, 2017.[50] Before July 13, Credit Suisse confirmed with Elting that she was formally aligning with three bidders, including the Blackstone Group L.P.[51]

### F. First Round of the Sale Process

On July 13, 2017, Credit Suisse received non-binding indications of interest from approximately sixteen participants.[52] Elting did not submit a specific

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.* at 6. Elting's counsel described her relationship with Blackstone as follows: "Ms. Elting and Blackstone intend for her to retain a 20% stake in the Company post-transaction. She would have a senior management role in the Company and a leadership position on the Board." Dkt. 1236 (Ex. 1 at 1).

[52] Dkt. 1185 (Pincus Ltr. Annex A at 6).

indication of interest but stated her interest in the Company through private equity partners (including Blackstone) in a written letter to the Custodian.[53]

The proposals ranged in indicated enterprise value from $480 million to $1,040 million.[54] Fifty-five participants declined to submit an indication of interest after reviewing the confidential information package. According to Credit Suisse, the most common reasons for not submitting an indication of interest included "(i) unwillingness to further engage in the Sale Process given the frequent and ongoing litigation surrounding the Sale Process and the Company, (ii) the financial prospects of the Company, (iii) concerns with respect to technology disintermediation and (iv) lack of resources to fully pursue the opportunity."[55]

On July 14, 2017, Credit Suisse provided the Custodian an analysis of the indications of interest received on July 13, 2017, summarizing the price ranges and certain relevant terms of each submission.[56] The Custodian determined that ten bidders would be asked to participate in the next round of the sale process, based on the following criteria: "price range, perceived ability to obtain financing sources,

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at 7.

investment thesis and proven ability of the participant to consummate difficult transactions."[57]

## G. Second Round of the Sale Process

On August 7, 2017, Credit Suisse provided the ten bidders selected from the first round with access to a data room and invited them to meet with certain members of senior management.[58] The bidders also received more detailed financial and business information concerning the Company (including a quality of earnings report, IT report, and tax factbook) and access to selected senior management of the Company to conduct business and financial due diligence.

On August 21, 2017, Credit Suisse sent a letter to the remaining bidders requesting that they submit revised offers by September 7, 2017.[59] "[B]idders were directed to assume the purchase of 100% of the outstanding equity interests in the Company on a debt-free, cash-free basis with normal levels of working capital and that the transaction would not be conditioned on either (i) the existence of any non-

---

[57] *Id.*

[58] *Id.*

[59] Credit Suisse requested that the bids include the following information: "(i) a non-binding enterprise valuation, expressed as a single number together with any conditions or qualifications attached to such value and any major assumptions underlying such value, (ii) financing sources, (iii) investment thesis and plan, (iv) due diligence requirements, (v) required contract terms, including the bidder's position on certain key terms and conditions to be included in a definitive agreement, (vi) required approvals, and (vii) any other information the bidder deemed relevant." *Id.* at 8.

21

competition obligations of the Company's stockholders or (ii) the resolution of any litigation involving the Company or the Custodian other than the approval of the Court as required by the Sale Order and any appeal of that decision to the Supreme Court of the State of Delaware."[60]

On and after September 7, 2017, Credit Suisse received revised bids from eight bidders that ranged in "headline" enterprise value from $650 million to $965 million.[61] One of the bidders was H.I.G. Middle Market, LLC, which owns a majority interest in Lionbridge Technologies, Inc., TransPerfect's leading competitor.[62] Two bidders that participated in the second round declined to submit revised bids.[63] Elting did not submit a specific bid but, in a letter to the Custodian, she stated her continued interest in the Company through a potential partnership with Blackstone, which continued in the process.[64]

In consultation with Credit Suisse and his legal advisors, the Custodian declined to continue discussions with one of the bidders because of the bidder's stated inability to consummate a transaction without certain conditions.[65] Although

---

[60] *Id.*

[61] *Id.*

[62] H.I.G.'s access to certain content in the data room was limited to protect competitively sensitive information. *Id.* at 7.

[63] *Id.* at 8.

[64] *Id.* at 8.

[65] *Id.* at 9.

this bidder submitted a bid providing for an indicated enterprise value of $965 million, the bidder indicated that any transaction would be subject to certain conditions, including receipt of non-competition and non-solicitation agreements from the Company's stockholders and the resolution of certain litigation.[66]

The Custodian and Credit Suisse also considered eliminating H.I.G. in light of the complications of including a strategic buyer in the process and the revised offer's low headline enterprise value of $750 million.[67]    With the Custodian's permission, however, H.I.G. submitted a revised bid providing for a headline enterprise value of $900 million and received permission to remain in the sale process.[68]

## H.    The Wordfast Controversy

As the sale process was unfolding, Shawe informed the Custodian and Grant Thornton (in a draft management representation letter) that a large portion of the Company's business was dependent on software and/or source code owned by Wordfast LLC, an entity Shawe and Elting owned on a 50-50 basis.[69]  According to Shawe, "WordFast technology is used in over 70% of TransPerfect's translation

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Dkt. 1185 (Pincus Ltr. at 21).

23

jobs."[70] Shawe conceded that the Company had an implied license to use Wordfast's software but argued that the license was revocable and not royalty-free.[71] Shawe contended that the Company owed Wordfast a material amount of fees from 2006 forward and, upon a sale to a third party, likely would be facing annual fees of up to $10 million to use Wordfast's technology.[72]

Although Elting sought at the outset of this litigation (and ultimately obtained) an order to dissolve another entity associated with TransPerfect's business that Shawe and Elting jointly owned (*i.e.*, Shawe & Elting LLC), she failed to seek any relief concerning Wordfast.[73] Thus, Shawe's contentions concerning Wordfast remained an open issue in the sale process.

On September 27, 2017, the Custodian filed an application for a declaration that the Company and/or its subsidiaries held a non-exclusive, irrevocable, and royalty-free implied license to use any and all software and source code owned by Wordfast.[74] Although the Custodian sought this declaration on a paper record, the court determined that there were factual issues about the nature and scope of the

---

[70] Dkt. 1060 (Ex. G at 2).

[71] Dkt. 1060 ¶ 2.

[72] Dkt. 1024 ¶ 4.

[73] *Shawe & Elting LLC*, 2015 WL 4874733, at *38-41.

[74] Dkt. 1024 (Appl. for Decl. Relief).

implied license that necessitated an evidentiary hearing.[75]  In response to the Custodian's request for an expeditious resolution, the court scheduled the hearing to begin on November 22, 2017.  On November 15, 2017, the night before Shawe's deposition was scheduled to take place, Shawe and Ms. Shawe filed a notice of removal of the Wordfast matter to the United States District Court for the District of Delaware.  This necessitated cancellation of the evidentiary hearing unless and until the district court remanded the case.[76]

## I.     Third Round of the Sale Process

On October 16, 2017, Credit Suisse sent a process letter to four bidders, including Blackstone, H.I.G., and Shawe, inviting each of them to provide a mark-up of a draft sale agreement that the Custodian's legal advisors had prepared (the "Form Sale Agreement") by October 30, 2017, and to submit a final bid by November 8, 2017.[77]  The Form Sale Agreement provided to the bidders contained an "exclusivity" provision with no fiduciary out and a release of claims relating to, among other things, the selling stockholders' ownership of shares of the Company and the sale process.[78]  Credit Suisse also provided the bidders additional access to selected senior management at the Company to conduct further business and

---

[75] Tr. 58-59 (Oct. 25, 2017).

[76] Dkt. 1173; Dkt. 1144.

[77] Dkt. 1185 (Pincus Ltr. Annex A at 9).

[78] Dkt. 1242 (Ex. 1 §§ 7.9, 8.2).

financial due diligence. Credit Suisse, the Custodian, and his legal advisors had numerous telephone conversations with the bidders regarding due diligence issues, litigation relating to the sale process, and draft mark-ups of the sale agreement.[79]

On October 30, 2017, H.I.G., Blackstone, and Shawe submitted mark-ups of the Form Sale Agreement to the Custodian's legal advisors.[80] The fourth remaining bidder informed Credit Suisse that it declined to continue in the sale process for reasons that included: "(i) risks relating to the validity of a non-exclusive, irrevocable, royalty-free implied license between Wordfast LLC and the Company (ii) lack of infrastructure and (iii) recent departures of certain employees."[81]

On November 8, 2017, H.I.G., Blackstone, and Shawe submitted their final bids, which ranged in headline enterprise value from $700 million to $900 million.[82] After receiving these bids, Credit Suisse worked with Mostrom and tax teams at Ernst & Young and Skadden to prepare an analysis to compare the bids on an apples-to-apples basis, going from enterprise value to net purchase price on a pre-tax and post-tax basis.[83] This bid analysis included adjusting for differences in transaction

---

[79] Dkt. 1185 (Pincus Ltr. Annex A at 10).

[80] *Id.*

[81] *Id.* Toward the end of the bidding process, "there was an unusually timed wave of exits from the technology division and other divisions overseen by Mr. Shawe, led in the first instance by the Chief Technology Officer and the Chief Information Officer. . . A total of more than 11 departures occurred during this time." Dkt. 1185 (Pincus Ltr. at 20).

[82] Dkt. 1229 (Pincus Aff. Ex. 1).

[83] Dkt. 1185 (Pincus Ltr. Annex A at 11).

type (*e.g.*, asset vs. stock transaction), definitions of cash, treatment of debt-like items, treatment of certain company fees and expenses, and items subject to escrows.[84] The bid analysis showed that, after accounting for adjustments, the three bids yielded aggregate after-tax net proceeds to the stockholders that ranged widely from $130.3 million to $527.3 million, with Shawe's bid yielding the highest amount of after-tax net proceeds and Blackstone's yielding the lowest.[85]

### J. Submission of Final Bids

After receiving the three bids on November 8, 2017, Credit Suisse, at the direction of the Custodian, pressed each bidder to improve his or its bid by increasing the gross payment and/or decreasing proposed deductions, which Credit Suisse discussed with the bidders on a line item basis.[86] For Blackstone, the feedback "focused on its lower relative headline enterprise value, its treatment of debt-like items and company fees and expenses, the significant level of conditionality in its bid, and large escrow amounts tied to the execution of non-compete and non-solicitation agreements by each seller and to cover [litigation] costs."[87] For H.I.G., the feedback "focused primarily on its treatment of debt-like items, the inclusion of a seller note as a portion of its purchase price, the impact of additional taxes related

---

[84] Dkt. 1185 (Pincus Ltr. Annex A at 11).

[85] Dkt. 1229 (Pincus Aff. Ex. 1).

[86] Dkt. 1229 (Doolin Aff. ¶ 12); Dkt. 1185 (Pincus Ltr. at 40).

[87] Dkt. 1185 (Pincus Ltr. Annex A at 11).

to an asset sale structure, and the level of conditionality."[88] For Shawe, "given the construct of his bid," which was the least conditional, "the feedback focused primarily on price."[89]

After these discussions, the Custodian permitted each of the bidders to make a revised final offer on November 15, 2017. Neither the Custodian nor Credit Suisse indicated to the bidders that they would have another opportunity to bid after November 15.[90] Credit Suisse, at the Custodian's direction, affirmatively told H.I.G. that it may not have another opportunity to bid.[91]

On or about November 15, H.I.G., Blackstone, and Shawe submitted revised bids that the Custodian's advisors valued in the manner depicted in Table 1 below:[92]

---

[88] Dkt. 1185 (Pincus Ltr. Annex A at 11).

[89] *Id.*

[90] Dkt. 1229 (Pincus Aff. ¶ 8); Dkt. 1229 (Doolin Aff. ¶ 15).

[91] Dkt. 1229 (Doolin Aff. ¶ 15).

[92] Dkt. 1229 (Pincus Aff. Ex. 1).

| Table 1 | H.I.G. | Blackstone | Shawe |
|---|---|---|---|
| Cash at close | 800 | 740 | 710 |
| Face value of seller note | 125 | - | - |
| Enterprise value | 925 | 740 | 710 |
| Discount to seller note | (12.5) | - | - |
| Total included cash and cash equivalents | 26.1 | 6.2 | 31.2 |
| Total indebtedness | (43.4) | (51) | - |
| Total company fees and expenses | (33.6) | (28.1) | (17.7) |
| Net purchase price (before escrow) | 861.6 | 667 | 723.6 |
| Total escrow amounts | (53.5) | (246.7) | (9) |
| Net purchase price (after escrow) | 808.1 | 420.4 | 714.6 |
| Est. stock sale tax | (223.9) | (162.7) | (180.5) |
| Est. asset deal tax implication | (45.2) | (39.7) | - |
| Tax implication indemnification | 15 | - | - |
| **Proceeds to stockholders** | **554** | **218** | **534.1** |

In the Custodian's judgment, the November 15 bids reflected only marginal improvements over the November 8 bids, and Blackstone's bid simply "was not competitive."[93] Although Blackstone marginally increased its headline enterprise value (from $725 million to $740 million) and reduced some of its deductions, it

---

[93] Dkt. 1185 (Pincus Ltr. at 40).

continued to require a holdback of a substantial portion of the purchase price ($200 million) that would be released to the sellers only upon their execution of non-compete and non-solicitation agreements. This was a non-starter because Shawe had made clear that he would never agree to such restrictions.[94]

As for the remaining two bidders, the Custodian determined, after consulting with his legal advisors and Credit Suisse, that "neither Mr. Shawe nor [H.I.G.] likely would improve substantially their respective bids without being offered a definite opportunity to buy the Company."[95] Thus, in order to obtain more value than what was on the table, the Custodian had to decide whether to engage with Shawe or H.I.G. After considering the discussions that had occurred "with the final three bidders over the prior ten days" and consulting with his advisors, the Custodian decided to engage with Shawe rather than H.I.G.[96] As discussed below, the Custodian made this decision, notwithstanding Shawe's lack of cooperation during the sale process, because he believed that Shawe would offer greater consideration than H.I.G. could deliver with fewer closing conditions and other better terms while retaining virtually all of the Company's employees.[97]

---

[94] Dkt. 1185 (Pincus Ltr. at 40); Dkt. 1185 (Pincus Ltr. Annex A at 12); Tr. 28 (Jan. 17, 2018). The $200 million holdback for restrictive covenants is included in Table 1 in the line item for "total escrow amounts."

[95] Dkt. 1185 (Pincus Ltr. at 40).

[96] *Id.* at 41.

[97] *See infra.* III.B.2.

**K.    Execution of a Definitive Sale Agreement**

On November 16, 2017, the Custodian and his corporate counsel met with Shawe and his corporate counsel. The Custodian informed Shawe that, although the Custodian "had received bids from third parties with higher 'headline values' for the Company," the Custodian was prepared to accept Shawe's offer to acquire the Company "if he agreed to increase its implied aggregate enterprise value to $775 million, which was approximately $70 million higher than his earlier non-binding proposal."[98]    After further discussions, the Custodian and Shawe agreed to a proposed acquisition at a $770 million implied aggregate enterprise value, subject to executing a mutually acceptable agreement before November 20, 2017.

On November 19, 2017, a securities purchase agreement and other ancillary agreements (collectively, as defined above, the "Sale Agreement") were executed. In accordance with his authority under paragraph 9 of the Sale Order, the Custodian executed the Sale Agreement on behalf of Elting as well as the Company.

In the Custodian's opinion, the Sale Agreement offered the greatest amount of after-tax net proceeds to stockholders than any other bid to date with the least conditionality. A side-by-side comparison of the implied value of the economic terms of the Sale Agreement and H.I.G.'s November 15 bid, which Credit Suisse

---

[98] Dkt. 1185 (Pincus Ltr. at 43).

prepared before the Custodian signed the Sale Agreement,[99] is set forth in Table 2 below:

| Table 2 | H.I.G. | Shawe |
|---|---|---|
| Cash at close | 800 | 770 |
| Face value of seller note | 125 | - |
| Enterprise value | 925 | 770 |
| Discount to seller note | (12.5) | - |
| Total included cash and cash equivalents | 26.1 | 31.2 |
| Total indebtedness | (43.4) | - |
| Total company fees and expenses | (33.6) | (18.7) |
| Net purchase price (before escrow) | 861.6 | 782.6 |
| Custodian escrow amount | (35) | (5) |
| Purchase price adjustment escrow | (13.9) | (4) |
| Indemnity escrow amount | (4.6) | |
| Total escrow amounts | (53.5) | (9) |
| Net purchase price (after escrow) | 808.1 | 773.6 |
| Est. stock sale tax | (223.9) | (199.1) |
| Est. asset deal tax implication | (45.2) | - |
| Tax implication indemnification | 15 | - |
| **Proceeds to stockholders** | **554** | **574.5** |

---

[99] Dkt. 1229 (Pincus Aff. ¶ 2).

The Sale Agreement provides that PRS Capital LLC, a New York limited liability company of which Shawe is the sole and managing member, will purchase all of Elting's shares of TransPerfect common stock for $385 million cash, subject to certain adjustments. The transaction is estimated to yield Elting approximately $287.2 million in after-tax net proceeds. According to the Custodian, the aggregate implied enterprise value of the transaction represents over ten times the Company's adjusted EBITDA for the twelve-month period ending September 30, 2017.[100]

The Sale Agreement contains an "exclusivity" provision with no fiduciary out and reciprocal releases of claims that are substantively the same as the provisions contained in the Form Sale Agreement that was distributed to the final bidders in October 2017.[101] The Sale Agreement also contains customary representations, warranties, covenants, and conditions to closing, including the requirement that a final, non-appealable court order approving the transaction be obtained prior to the closing.[102] Elting is required to indemnify PRS Capital LLC, its affiliates (including Shawe), and their representatives only in the event of a breach of certain

---

[100] Dkt. 1185 (Pincus Ltr. at 47).

[101] Dkt. 1185 (Pincus Ltr. Annex C §§ 7.9, 8.2(a)-(b)). One difference between the Form Sale Agreement and the final Sale Agreement is a carve-out in Elting's release for certain claims that are discussed below. *See* III.B.5.

[102] Dkt. 1185 (Pincus Ltr. Annex C § 9.1(b)).

"fundamental" representations made by Elting or any covenant to be performed by Elting after the closing of the transaction.[103]

## L.    H.I.G. Submits Another Bid After the Sale Process Ends

On November 22, 2017, after executing the Sale Agreement, the Custodian received a revised, improved proposal from H.I.G., which provided for (i) an implied aggregate enterprise value of the Company of $850 million, (ii) fewer deductions to the purchase price than H.I.G.'s prior proposals, (iii) a tax indemnification and gross up of the stockholders to accommodate the structure of the proposal, and (iv) fewer conditions to closing (including no condition regarding the Wordfast license) than H.I.G.'s prior proposals.[104]  Under the exclusivity provision in the Sale Agreement, the Custodian and his advisors were prohibited from engaging in discussions or negotiations with H.I.G.[105]

The Custodian internally reviewed H.I.G.'s proposal with Credit Suisse and his legal advisors and determined that the bid likely would provide an aggregate of approximately $15 million of additional after-tax net proceeds to all of the Company's stockholders, meaning that it would yield approximately $7.5 million of additional after-tax net proceeds to Elting.[106]  According to the Custodian, however,

---

[103] Dkt. 1185 (Pincus Ltr. Annex C § 10.2).

[104] Dkt. 1185 (Pincus Ltr. at 48-49).

[105] *Id.* at 49, Annex C § 7.9.

[106] Dkt. 1185 (Pincus Ltr. at 49); Dkt. 1229 (Pincus Aff. Ex. 1).

34

H.I.G.'s proposal likely would be more difficult to close than the proposed sale to Shawe and "would not provide the same level of finality as the Sale Agreement with respect to the disputes between Ms. Elting and Mr. Shawe, and . . . could adversely affect the Company's ability to continue as a going concern (consistent with its current state), particularly given that [H.I.G.] owns the Company's largest competitor."[107]

## II. PROCEDURAL POSTURE

On December 7, 2017, H.I.G. filed a motion to intervene for the purpose of filing an objection to the Custodian's execution of the Sale Agreement. On December 19, 2017, the court denied that motion because (i) H.I.G., as a non-party, lacked standing to assert such an objection under the Sale Order, which expressly limits to the "parties" to these actions (C.A. Nos. 9700-CB and 10449-CB) the right to submit "any objections to the sale process or the terms" of any agreements the Custodian submits to the court for approval, and (ii) H.I.G. expressly waived any claims relating to the sale process in a contract it entered into with TransPerfect as a condition to participating in the sale process.[108]

---

[107] Dkt. 1185 (Pincus Ltr. at 49).

[108] Dkt. 1215. On November 2, 2017, the court denied a similar motion to intervene filed by a TransPerfect employee (on behalf of a group of employees interested in making a bid) for lack of standing under the Sale Order. Dkt. 1110.

On December 21, 2017, Elting filed a lengthy objection to the proposed sale. The objection does not advocate that the Custodian should have closed a deal with Blackstone, with whom Elting partnered and whose bid was clearly inferior to the final bids submitted by H.I.G. and Shawe. Elting's objection instead asks the court to reject the proposed sale to Shawe and to direct the Custodian to negotiate a transaction with H.I.G.

Shawe and Ms. Shawe filed responses to Elting's objections supporting the Custodian's recommendation. After the parties were afforded the opportunity to fully brief the issues, a hearing was held on January 17, 2018, and supplemental submissions were filed thereafter.

The same day she filed her objection, Elting filed a new lawsuit against Shawe in this court seeking damages. The complaint asserts that Shawe breached his fiduciary duties and violated the Sale Order by "intentionally interfering with the sale process" and "intentionally undermining the Custodian's efforts to undertake a fair auction to maximize stockholder value in accordance with the Sale Order."[109] According to the complaint, "Shawe's misconduct depressed TPG's sale price by more than $200 million."[110]

---

[109] Dkt. 1 (C.A. 2017-907) ¶ 40.

[110] *Id.* ¶ 6.

## III. ANALYSIS

Elting asserts several objections to the proposed sale. Before turning to them, I address the threshold issue of what standard of review applies to the court's consideration of Elting's objections.

### A. Standard of Review

The Sale Order expressly provides that the court "shall approve" any definitive sale agreement and any related agreements the Custodian enters into "unless the objecting party shows an abuse of discretion by the Custodian in connection with the sale process or the terms of the Agreements."[111] The Sale Order further provides that "[a]ll interim actions, recommendations and decisions of the Custodian" are subject to court review under an abuse of discretion standard.[112]

This court has adopted an abuse of discretion standard in similar orders involving the court-ordered sale of a corporation.[113] Relying on those authorities, Elting fully supported the inclusion of the abuse of discretion standard when the Sale Order was under consideration. Elting explained at that time that, "to the extent Shawe is lobbying for a more exacting standard of review than 'abuse of discretion,'

---

[111] Dkt. 848 ¶ 18(d).

[112] Dkt. 848 ¶ 15.

[113] *See, e.g. Supreme Oil*, 2015 WL 2455952, at *6 (abuse of discretion standard for interim decisions); *Carlisle Etcetera*, 2015 WL 10371435, at *3 (same).

it is not warranted here, and the cases [Shawe] cites do not support it."[114]  Elting also argued that corporate law principles applicable to directors of Delaware corporations should *not* govern the Custodian's "actions in managing and effectuating the sale process ordered by the Court."[115]

Despite the inclusion of an abuse of discretion standard in the Sale Order and Elting's endorsement of the standard when the court entered the Sale Order, Elting has reversed course.  Unsatisfied with the outcome of the sale process, Elting now argues that the court should apply an entire fairness standard in deciding whether or not to approve the Sale Agreement.  The theory for this reversal of position is that the Custodian had a conflict of interest when he entered into the Sale Agreement because Shawe "relentlessly attacked the Custodian and his law firm in the media and sued the Custodian personally in multiple courts."[116]  I find the argument unpersuasive.  Before explaining why, some further factual context is necessary.

During the sale process, Shawe filed two lawsuits against the Custodian.  In one action, filed after the Delaware Supreme Court rejected their appeal, Shawe and his mother sued the Custodian and the Delaware Secretary of State in the United States District Court for Delaware.  The complaint advances claims under the

---

[114] Dkt. 840 at 6 n.3.

[115] *See* Dkt. 840 at 5 (arguing against application of the business judgment rule).

[116] Objection 28.

38

Takings and Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. The Shawes never raised these claims at trial in this action, and the Delaware Supreme Court deemed them waived when the Shawes appealed the Sale Order.[117] On September 26, 2017, the district court dismissed Shawe's constitutional claims, concluding that they were barred under the *Rooker-Feldman* doctrine.[118]

In the second action, filed on September 1, 2017, Shawe sued the Custodian in the United States District Court for the Southern District of New York. The complaint there asserts putative constitutional claims that reflect, in my view, Shawe's displeasure with the Custodian's steadfast refusal to bend to his will during the sale process.[119] The Custodian moved to dismiss that action, which was stayed after the execution of the Sale Agreement was announced.

---

[117] *Shawe v. Elting*, 157 A.3d at 169.

[118] *Shawe v. Pincus*, 265 F. Supp.3d 480, 483 (D. Del. 2017). The Shawes filed an appeal of the district court's dismissal in the United States Court of Appeals for the Third Circuit and sought expedition of that appeal. They also filed a motion in the district court to stay the sale process. On October 27, 2017, the district court denied the Shawes' motion to stay the sale process. On November 6, 2017, the Third Circuit denied their motion to expedite, and, on November 15, the Third Circuit ordered that the Shawes' claims be submitted to mediation. Dkt. 1185 (Pincus Ltr. at 24).

[119] *See Shawe v. Pincus*, 17-cv-6673 (S.D.N.Y. 2017) (alleging that the Custodian violated Shawe's constitutional rights by threatening to seek sanctions against him for commencing litigation and for failing to execute a management representation letter).

In addition to these two actions, Timothy Holland, a TransPerfect employee who works exclusively for Shawe according to Elting,[120] filed an action in the United States District Court for the Southern District of New York against the Custodian and the Chancellor, asserting that the Sale Order chilled his exercise of his First and Fourth Amendment rights.[121]  On September 19, 2017, the district court dismissed that action under the *Younger* abstention doctrine.[122]

Holland also is the incorporator of "Citizens for a Pro-Business Delaware,"[123] an organization that ran ads criticizing the expenses that were incurred as a result of the sale process, including fees paid to the Custodian's law firm.[124]  In that vein, Shawe sent emails to the Custodian late in the sale process questioning Skadden's bills and intimating that he might seek to challenge them.[125]

In my opinion, the lawsuits filed against the Custodian and the media attention he has received have not compromised his independence in any way that would

---

[120] Appellee's Answering Br. (No. 423, 2016) 43.

[121] *Holland v. Bouchard*, 2017 WL 4180019, at *2 (S.D.N.Y. Sept. 19, 2017).

[122] *Id.* at *1.  An appeal of this dismissal is pending.

[123] Appellee's Answering Br. (No. 423, 2016), App. B3579.

[124] Dkt. 1219 (Golden Aff. Exs. C-E).

[125] Dkt. 1171 (Ex. A at 2); Dkt. 1219 (Golden Aff. Ex. F at 2-3).  The court has received monthly reports from the Custodian requesting approval of his fees and expenses since April 2015, after the Custodian was first appointed as a mediator in March 2015.  *See* Dkt 544, 515.  Copies of these reports were served on the parties when they were filed with the court.  Shawe never questioned the Custodian's expenses until late in the sale process.  Dkt. 1088.

warrant deviating from the abuse of discretion standard in the Sale Order. Claims for damages were not asserted in any of these cases. Each of them seeks solely injunctive or declaratory relief. The Custodian views the claims asserted in these cases as frivolous, an assessment with which Elting agrees.

Most importantly, irrespective of which bidder the Custodian selected as the winner, the Custodian and his law firm have no appreciable risk of liability and are be fully covered for the costs of defending against these lawsuits or any other litigation relating to the sale process. The Custodian and his law firm are protected by judicial immunity and robust indemnification and advancement rights set forth in the Sale Order.[126] Thus, even if one accepts that selecting Shawe as the winner of the auction secured something that other bidders could not deliver (*i.e.*, dismissal of the lawsuits Shawe filed against the Custodian), the Custodian's ability to exercise disinterested and independent judgment in selecting the winning bid was not compromised in my view.[127] To repeat, no matter which of the final bids the Custodian selected, he and his law firm are fully protected from any financial exposure from an aggrieved bidder relating to the sale process.

---

[126] Dkt. 848 ¶ 16.

[127] *See In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *14 (Del. Ch. Jan. 31, 1989) (refusing to apply entire fairness even though it was "less likely that the directors would be exposed to personal liability . . . if [a certain bidder] prevailed in the auction" because the special committee members enjoyed indemnification rights under either scenario).

41

Insofar as media attention is concerned, it is telling that no one ever contacted the Custodian to complain about the sale process as a result of any advertisements that were run by the so-called "Citizens for a Pro-Business Delaware."[128] And the notion that the Custodian's independence was compromised as a result of such attention runs counter to his professional reputation as a highly experienced transactional lawyer and to the personal qualities that compelled the court to select him for the position in the first place. Indeed, until the winning bidder was selected, Elting's team only had high praise for the Custodian's performance, viewing him as someone of "unquestionable honesty and integrity."[129] In short, the record is devoid of any evidence to credibly suggest that Shawe's litigiousness or the media attention associated with this case created a disabling conflict of interest or compromised the Custodian's independence in any way that would warrant deviating from the abuse of discretion standard in the Sale Order, for which Elting herself advocated.

Our Supreme Court has explained that a decision will not be overturned as an abuse of discretion if the decision "was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[130] Stated another way, a court will

---

[128] Dkt. 1229 (Pincus Aff. ¶ 21).

[129] *See, e.g.*, Tr. at 102 (Elting's lead trial counsel) (Jan. 17, 2018).

[130] *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968).

overturn a decision for abuse of discretion only if it was "arbitrary or capricious"[131] or "exceeds the bounds of reason in light of the circumstances."[132]  This is the standard I will apply in reviewing Elting's objections.

## B.     Elting's Objections

In support of her request that the court reject the Custodian's recommendation for approval of the Sale Agreement and direct the Custodian to reopen negotiations with H.I.G., Elting advances essentially five objections.  Specifically, Elting contends that the Custodian abused his discretion by:

- failing to seek relief from the court to address misconduct by Shawe that allegedly undermined the sale process;

- deciding to focus on negotiating a transaction with Shawe instead of H.I.G. at the end of the sale process;

- making certain adjustments in valuing H.I.G.'s bids relating to the litigation risk posed by Shawe;

- failing to include a fiduciary out provision in the Sale Agreement;

- agreeing to releases in the Sale Agreement that would (i) bar Elting from asserting claims against Shawe regarding his alleged misconduct during the sale process and (ii) treat differently the method for resolving certain claims Shawe and/or his mother have asserted against Elting and others.

I address each objection in turn.

---

[131] *Lankford v. Lankford*, 157 A.3d 1235, 1241 (Del. 2017) (citing *Wright v. Wright*, 49 A.3d 1147, 1150 (Del. 2012)).

[132] *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009) (citing *In re MCA, Inc., S'holder Litig.*, 785 A.2d 625, 633–634 (Del. 2001)).

43

## 1.  Failing to Seek Relief from the Court

Elting contends that "the Custodian abused his discretion when he continued to refrain from seeking relief from the Court, even after realizing that Shawe's actions were undermining the sale process."[133]  Deciding to seek judicial relief in the midst of a court-ordered sale process is a classic matter of judgment.  In my opinion, the record does not support Elting's assertions that the Custodian abused his discretion in making the judgments he did with respect to seeking judicial recourse against Shawe.  To the contrary, the record convinces me that the Custodian deftly handled a difficult situation that resulted in a highly favorable outcome for Elting.

To be sure, in recommending the Sale Agreement to the court for approval, the Custodian candidly expressed his belief that Shawe's litigiousness had caused some potential third-party bidders not to participate in the sale process, and had caused some who did participate to discount their proposals or to demand large escrows for the litigation risk of dealing with Shawe.[134]  And, as Elting repeatedly points out, the Custodian understandably came to have a dim view of Shawe's character, telling him in one heated email exchange:  "You are the most dishonest and dishonorable person I have ever met."[135]  That said, the record reflects that

---

[133] Objection 36.

[134] Dkt. 1185 (Pincus Ltr. at 12).

[135] Dkt. 1169 (Ex. A at 1).

"despite the litigations and Mr. Shawe's litigious conduct (and that of his close colleagues), [the Custodian and his advisors] were able to generate participation in the Modified Auction by certain important strategic and private equity groups," which created a competitive dynamic to maximize the value of Elting's shares.[136]

Contrary to the position Elting takes now, the Custodian did not cower to Shawe's antics. When Shawe and his putative confederate (Holland) sued him, the Custodian defended the litigations vigorously, obtaining the dismissal of two of them so far. When Shawe refused to sign a management representation letter that was necessary for Grant Thornton to complete its audit, the Custodian threatened to exclude Shawe from the sale process until Shawe backed down.[137] And when Wordfast became a point of controversy in the sale process—a controversy that likely could have been avoided had Elting brought the issue up when this litigation began—the Custodian promptly approached the court and requested an expedited ruling to determine the scope of the Company's implied license with Wordfast.

Also contrary to Elting's position, the Custodian exercised prudence in not acting precipitously with respect to a range of other matters involving Shawe. For example, Elting accuses Shawe of orchestrating the resignation of senior IT employees late in the sale process, but Elting herself stated publicly at the time that

---

[136] Dkt. 1185 (Pincus Ltr. at 12).

[137] Custodian's Reply 27.

45

their departures were a positive development for the Company.[138] Elting also accuses Shawe of masterminding a "phishing attack" and manipulating the EBITDA of divisions under his control, but the evidence concerning these accusations is speculative, circumstantial, and contested—so much so that Elting effectively abandoned these charges at the court's last hearing in this matter.[139]

As the Custodian recognized, running to court in reaction to each of Shawe's antics risked causing delay and confusion that not only could have undermined the sale process, but also could have injured the Company, its employees, and its client base.[140] As importantly, as the Custodian also recognized, excluding Shawe from the sale process or seeking to impose a noncompete on him would not necessarily have benefitted the process. In the Custodian's judgment, "Shawe's participation as a bidder (a widely known event) likely resulted in one of the bidders increasing

---

[138] Dkt. 1229 (Klein Aff. Ex. B at 2) (October 25, 2017 article in *Slator* quoting Elting: "[T]he recent departures of these few technology employees represent a very positive, not negative, development at TransPerfect, as I have long regarded each of them as underperformers.").

[139] *Compare* Dkt. 1219 (Elting Aff. ¶¶ 7-12) (describing "circumstantial evidence" of Shawe's involvement in phishing incident) *with* Dkt. 1227 (Finger Aff. Ex. 14) (email summarizing investigation of the phishing incident, which suggests that the account involved had been hacked) and Dkt. 1229 (Pincus Aff. ¶ 15) ("I am aware of no evidence that Mr. Shawe directed a phishing incident at the Company."); *compare* Dkt. 1219 (Pasko Aff. ¶¶ 11-13) (accusing Shawe of depressing EBITDA in divisions under his control) *with* Dkt. 1227 (Lee Aff. ¶¶ 6-9) (explaining the impact technology developed by Shawe's divisions had on Elting's divisions and the enhancement of their profit margins).

[140] Dkt. 1229 (Pincus Aff. ¶ 16).

46

its bid significantly and, in turn, causing Mr. Shawe to increase his bid."[141] In short, the record reflects that the Custodian strategically addressed Shawe's conduct while minimizing delay and disruption to the sale process and maintaining a competitive dynamic by keeping Shawe in the bidding process. This reflects sound judgment—the antithesis of arbitrary or capricious decision-making.

Finally, if Shawe had taken actions that were so detrimental to the sale process as to amount to an abuse of discretion by the Custodian for not seeking recourse against Shawe, one must ask—where was Elting? She previously received reimbursement of more than $7 million of her litigation expenses from Shawe and knew that the court was prepared to impose sanctions when presented with a factual record warranting judicial relief. And the Sale Order expressly provides that "any party" may seek sanctions against the other, including the imposition of post-employment restrictions, for impeding or undermining the sale process.[142] Yet Elting never moved for such relief. The fact that Elting failed to seek relief from the court against Shawe during the sale process when she had every opportunity to do so fundamentally belies her belated assertion that the Custodian acted arbitrarily or capriciously for failing to seek further relief from the court against Shawe.

---

[141] Dkt. 1185 (Pincus Ltr. at 11).

[142] Dkt. 848 ¶¶ 12-13.

47

## 2. Focusing on Negotiating a Transaction with Shawe

Elting next contends that the Custodian abused his discretion by "opting, at some point soon after November 8, 2017, to focus on negotiating a transaction with Shawe to the exclusion of the other remaining bidders."[143] As discussed above, the Custodian made the decision to negotiate directly with Shawe after receiving final bids from Blackstone, H.I.G., and Shawe in mid-November. Blackstone's bid was not competitive. As to the two remaining bids, the headline enterprise value of the bids from H.I.G. and Shawe was $925 million and $710 million, respectively. More importantly, after accounting for certain adjustments and estimating the taxes that would be incurred, their bids translated to aggregate, after-tax net proceeds to stockholders of approximately $554 million (H.I.G.) and $534.1 million (Shawe).[144]

In my opinion, it was not an abuse of discretion for the Custodian to focus his efforts at this point on negotiating a transaction with Shawe. To the contrary, the Custodian had numerous sound reasons for pursuing that course.

First, the Custodian believed at the time "that no other bidder, including [H.I.G.], likely would offer significantly greater consideration (net of required deductions and escrows) compared to the amount [he] believed Mr. Shawe would

---

[143] Objection 33.

[144] During the hearing and in her supplemental submission, Elting asserted that, as of mid-November, H.I.G.'s bid resulted in $65 million more in aggregate after-tax net proceeds to stockholders because of how certain escrows concerning the litigation risk posed by Shawe were treated. I address this issue in the next section.

pay."[145]  This belief was informed by previous discussions with H.I.G. and Shawe

that indicated to the Custodian that H.I.G.'s November 15 bid was near its limit,

while Shawe could increase his offer significantly.  As the Custodian explained in

an affidavit:

> Early in the bidding process, HIG submitted a bid that provided for an enterprise value, or "headline value," of $750 million.  Because of that low bid and the fact that HIG was a strategic competitor of TPG, I nearly informed HIG that it would not be permitted to move to the next round of bidding but ultimately decided to allow it to revise its bid. HIG submitted a revised bid providing for an enterprise value of $900 million.  When discussing HIG's initial mark-up of the draft securities purchase agreement, my advisors and I suggested to HIG's counsel that the absence of a tax indemnification would affect the value of HIG's proposal.  HIG's counsel informed us that HIG would not provide the indemnification, explaining that it was a stretch for HIG to get to $900 million.  I understood this discussion to mean that HIG was at or near the top of its price range, and that HIG was unlikely to agree to a meaningful increase in its offer price.  HIG's admission helped to inform my perspective on whether HIG would materially exceed the economics of the final deal that I negotiated with Shawe.  At the time I learned that HIG's $900 million bid was near its limit, I had reason to believe (based on earlier discussions with Shawe and the range of his second round bid) that Shawe could increase his offer to more than $765 million.[146]

Second, the Custodian believed that H.I.G. could not provide the limited

conditionality and certainty of closing presented by Shawe's proposal, which

included the fewest conditions to closing.[147]  For example, H.I.G.'s November 15

---

[145] Dkt. 1185 (Pincus Ltr. at 41).

[146] Dkt. 1229 (Pincus Aff. ¶ 6).

[147] Dkt. 1185 (Pincus Ltr. at 41-42).

offer continued to condition closing on a favorable resolution of the Wordfast licensing issue or some acceptable work around, and included a number of additional seller and Company covenants that needed to be performed or complied with between signing and closing.[148] The Custodian also believed it was more likely that H.I.G. (compared to Shawe) might try to claim a material adverse event between signing and closing, given that H.I.G. narrowed the number of events that would not constitute a material adverse event.[149]

Third, Shawe's proposed mark-up of the Form Sale Agreement "provided for almost no deductions from purchase price for 'debt-like' items or escrows for indemnification (as the other bidders had proposed) and required indemnification by Ms. Elting only for breach of certain 'fundamental' representations and warranties."[150]

Fourth, Shawe's proposal offered a final and complete resolution of certain outstanding claims and a dismissal of related litigation. In the Custodian's view, this would allow "the Company, its employees, its customers and other stakeholders to move forward."[151] Shawe's proposal also offered to indemnify Elting for any costs

---

[148] Dkt. 1229 (Pincus Aff. ¶¶ 10(a)-(b)).

[149] *Id.* ¶ 10(c).

[150] Dkt. 1185 (Pincus Ltr. at 41-42).

[151] *Id.* at 42.

or liabilities related to the equitable and legal claims asserted by a current senior manager and a former senior manager.[152]

Finally, given H.I.G.'s status as a strategic competitor through its ownership of Lionbridge, and the Custodian's understanding that H.I.G. hoped to achieve up to $40 million in synergies in a transaction with TransPerfect,[153] the Custodian understandably took into account the potential impact a transaction with H.I.G. would have on the Company as a going concern:

> When evaluating the bids, it was my belief, based on my professional experience and consultations with my advisors, that a portion of the synergies that HIG likely expected to realize as a result of any purchase of the Company would come from reduced headcount at TransPerfect, . . . that announcing a deal with HIG. . . would result in increased concern among the Company's employees and likely lead to further employee departures, which could . . . negatively impact the Company's business between signing and closing or leave the Company weakened if closing did not occur, . . . [and] that a deal with HIG also would create uncertainty, both in terms of the employees' questions about job security and a prolonged closing period, that . . .

---

[152] *Id.*

[153] Tr. 190 (Jan. 17, 2018); *see also* Objection 12 (noting that "a strategic acquiror could (and likely would) pay more for TransPerfect . . . because a strategic acquiror could include in its bid a portion of the value of synergies potentially accruing from a transaction" and that H.I.G. "was just such a strategic acquiror"). The Custodian asked through Credit Suisse and bid letters for post-closing plans from the bidders, "noting that he has an obligation to maintain the business as a going concern." Tr. 190-91 (Jan. 17, 2018). H.I.G. did not provide any meaningful detail of its post-closing plans at that time. *Id.* Shawe responded in writing as follows: "I plan to retain virtually all of the existing employees across Executive Leadership, Sales, Production, Technology, and Shared Services units, and not transfer jobs overseas or take other dramatic cost savings actions …." Dkt. 1229 at 11.

could negatively impact the Company's business and [the Custodian's] ability to deliver a healthy "going concern" to another bidder.[154]

By contrast, the Custodian believed that "Shawe's proposal most likely would maintain the Company as a going concern, without significant, if any, changes in the Company's operations and business, and with virtually no employee terminations."[155]

In sum, after receiving the final bids in mid-November, the Custodian had valid reasons to believe that initiating a negotiation with Shawe to close a deal offered the prospect of greater consideration than H.I.G. could deliver, fewer conditions to closing, and better terms concerning indemnification and the resolution of claims. Relevant to the court's dual mandate, the Custodian also had good reason to believe that negotiating with Shawe instead of the Company's leading competitor not only would maximize value for the stockholders, but also would retain virtually all of the Company's employees. Under these circumstances, I find that the Custodian's decision to engage with Shawe at this point was eminently reasonable and plainly not an abuse of discretion.

---

[154] Dkt. 1229 (Pincus Aff. ¶¶ 11-12).

[155] Dkt. 1185 (Pincus Ltr. at 42).

### 3. Deducting Escrows and Accepting an Allegedly Lower Offer

As depicted in Table 2 above, the Custodian's advisors estimated that the final Sale Agreement would yield aggregate after-tax net proceeds to stockholders of $574.5 million, or approximately $20 million more than H.I.G.'s November 15 bid. Elting challenges this contention. She argues that the Custodian abused his discretion by devaluing H.I.G.'s bid "by the amount of the reserves or escrows [it] included to address Shawe's misconduct and potential future wrongdoing," which caused the Custodian to sign "an agreement with Shawe at a price that was far less than the highest offer then pending."[156] There are two aspects to this grievance: the first concerns the decision to deduct the litigation escrows dollar-for-dollar in determining the net amount of proceeds to stockholders; the second concerns the calculation of estimated taxes on the transaction if one deducts those escrows from the anticipated proceeds of the transaction.

Elting asserts that the Custodian should not have deducted from H.I.G.'s November 15 bid the full amount of a $35 million escrow for potential litigation expenses.[157] This amount is the sum of three separate escrows: two that the

---

[156] Objection 39-40.

[157] The $35 million escrow is a line item in Table 2 entitled "Custodian escrow amount." For H.I.G.'s November 15 bid, Table 2 also includes a $13.9 million "Purchase price adjustment escrow" and a $4.6 million "Indemnity escrow amount." Thus, the total amount of the escrows for H.I.G.'s November 15 bid was $53.5 million. Although Elting argued at the hearing that it was an abuse of discretion to deduct the full $53.5 million in escrows from H.I.G.'s November 15 bid, she focused her criticisms on the $35 million escrow and

Custodian's advisors contractually required in their retention agreements ($15 million for Credit Suisse and $5 million for Alvarez & Marsal) and a third for the Custodian ($15 million).[158] Given his (eminently reasonable) belief that there would be less litigation exposure if Shawe was the buyer, the Custodian deducted $5 million from Shawe's bid for potential litigation expenses. Thus, the delta at issue is $30 million.

Estimating that the litigation risk of entering into a transaction with H.I.G. would be $30 million more than the litigation risk of entering into a transaction with Shawe certainly was not an abuse of discretion. Shawe is a serial litigator. According to the Custodian, Shawe and his close colleagues have filed over a dozen lawsuits since April 2016 as part of an orchestrated campaign against the sale process.[159] Apart from the three federal cases discussed previously in which the Custodian was named as a defendant, Shawe and/or his mother filed multiple cases against Elting, Elting's New York counsel, one of Elting's financial advisors, Elting's husband and his employer, and Elting's Delaware counsel.[160] And Shawe

---

did not provide any substantive explanation for challenging the treatment of the other two escrows. *See* Tr. 106-125 (Jan. 17, 2018). Accordingly, I focus on the $35 million escrow.

[158] Custodian's Reply at 17 n.9; Tr. 22-23 (Jan. 17, 2018).

[159] Dkt. 1185 (Pincus Ltr. at 8).

[160] *See Shawe v. Potter Anderson & Corroon LLP*, 2017 WL 6397342, at *2 (D. Del. Dec. 8, 2017) (asserting claim for prima facie tort against Potter Anderson & Corroon LLP (Elting's Delaware counsel) and one of its partners for allegedly misrepresenting certain fees that were part of the sanctions order against Shawe); *Shawe v. Kramer Levin Naftalis*

indicated that more litigation was likely to come by, for example, questioning Credit Suisse's independence in court filings late in the sale process.[161]

The Custodian's decision to deduct the full amount of the litigation escrows also was not an abuse of discretion. Elting suggests that the Custodian could have discounted those escrows based on the probability and timing of payment, but she offers no methodology for doing so, and taking this approach would have been speculative. The record of this case, on the other hand, bears out how expensive it is to engage in hard-fought litigation with someone like Shawe. Filings from the sanctions hearing against Shawe show that he and Elting together spent approximately $27 million litigating against each other in less than two years,

*& Frankel LLP*, No. 151025 (Sup. Ct. N.Y. Cty. 2017) (asserting claims for defamation and tortious interference with business advantage against Kramer Levin Naftalis & Frankel LLP (Elting's New York counsel), and two of its partners); *Shawe v. Kidron Corporate Advisors LLC*, No. 652482 (Sup. Ct., N.Y. Cty. 2016) (asserting double derivative claims for aiding and abetting breach of fiduciary duty against Kidron Corporate Advisors LLC (Elting's financial advisor) and one of its co-owners); *Shawe v. Cushman & Wakefield*, No. 652664 (Sup. Ct. N.Y. Cty. 2016) (asserting claims for breach of fiduciary duty, aiding and abetting, and prima facie tort against Cushman & Wakefield and Michael Burlant (Elting's husband and an executive director at Cushman & Wakefield)); *Shawe v. Elting*, No. 153375 (Sup. Ct. N.Y. Cty. 2016) (asserting claims for deceit and collusion with the intent to deceive a court and for malicious prosecution against Elting, Kramer Levin, and one of its partners); *Shawe v. Elting*, No. 155890 (Sup. Ct. N.Y. Cty. 2014) (asserting claims for assault, battery, intentional infliction of emotional distress, and punitive damages against Elting arising out of an incident during which Elting allegedly kicked Shawe).

[161] Dkt. 1051 at 2 (October 9, 2017 brief submitted by Shawe contending that Credit Suisse "has an overwhelming financial incentive to allow Lionbridge to acquire TransPerfect at the lowest price possible").

between December 2014 and July 2016.[162]  It was not arbitrary or capricious for the Custodian, who has over 35 years of experience in these matters, to deduct the full amount of the litigation escrows.

Elting further suggests that the Custodian could have subtracted the estimated litigation expenses from Shawe's portion of the amount paid at closing and not from Elting's portion.  But the obligation to indemnify the Custodian and his advisors for litigation expenses associated with the sale process logically would be a corporate expense of TransPerfect.  Consistent with that logic, the Sale Order specifically provides that the proceeds of the sale transaction would be distributed *pro rata* to stockholders after deducting any escrows for indemnification or advancement claims.[163]

In sum, perhaps a $30 million estimate to account for the difference in litigation exposure between a transaction with H.I.G. and one with Shawe ultimately would have proven to be too high or, given Shawe's proclivity to litigate at the drop

---

[162] *See* Dkt. 866 (Shannon Aff.); Dkt. 866 (Kaufman Aff.); Dkt. 866 (Stone Aff.); Dkt. 878 (Shane Aff.); Dkt. 878 (Finger Aff.); Dkt. 878 (Schmidt Aff.); Dkt. 878 (Goldstein Aff.); Dkt. 878 (Matteo Aff.); Dkt. 878 (Minkoff Aff.); Dkt. 878 (Ladig Aff.).

[163] *See* Dkt. 848 ¶ 14 ("In the event any fees and expenses of the Custodian or any counsel or advisors retained by the Custodian or by the Company at the Custodian's direction remain unpaid at the closing of the Sale Transaction (*or any claims for indemnification or advancement remain outstanding*), the Custodian may provide for the proceeds of the sale to be paid into an escrow account and for the unpaid fees and expenses (and any claims for indemnification or advancement) to be *deducted from the proceeds*, and then for the *proceeds to be distributed pro rata to the Company's stockholders*.") (emphasis added).

of a hat, too low.  It is impossible to know for sure.  In my view, however, it is obvious that the litigation expenses would have been substantial, and it was not an abuse of discretion for the Custodian, acting in consultation with his advisors, to make this assumption in valuing the bids under these circumstances.

The second aspect of Elting's grievance with the treatment of the escrows concerns a technical tax question.  Based on consultations with his tax advisors, the Custodian believed that "under the U.S. tax laws, funds that are placed into escrow for the benefit of a seller, including amounts to secure the payment of liabilities of the seller (even contingent liabilities), generally are treated as part of the taxable sale proceeds on the disposition of the subject property (*i.e.,* stock or assets) and are taxed to the seller in the year of closing regardless of when the funds are paid out of escrow."[164]  Accordingly, for purposes of calculating the estimated taxes associated with various bids, the total escrow amounts "were included as part of the taxable sale proceeds in the relevant offers."[165]

Although her position appears to have shifted, Elting offers a different perspective on the tax treatment of the escrow amounts.  According to Elting:

> The IRS has consistently held that the portion of a purchase price deposited in escrow to satisfy indemnity claims should be treated as an installment obligation and reported by the seller under the installment

---

[164] Dkt. 1235 at 2.

[165] *Id.* (citing Treas. Reg. §§ 1.1001-1(a), 1.1001-1(g); Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 10.31 (7th ed. 2000 & Supp. 2017-2)).

method pursuant to Internal Revenue Code Section 453. Under the installment sale method, income is recognized on installment obligations only as and when payments are received. No tax is payable on the escrowed amounts in the year of closing unless the seller affirmatively *elects out* of the installment method or is deemed to be in "constructive receipt" of the funds. Because the Custodian has characterized the escrowed amounts as "speculative and risky" . . . they could not be deemed constructively received.[166]

Without any affidavits or testimony from tax experts, the court is not in a position to reach any conclusions about this technical tax question. Nevertheless, it is clear to the court that the Custodian did not abuse his discretion in following the advice of his tax advisors, even if that advice was mistaken in some respect.

According to Elting, in mid-November, "when the Custodian chose to negotiate exclusively with Shawe, H.I.G. had offered at least $65 million more in after-tax proceeds than Shawe at that point."[167] As an initial matter, this $65 million figure is significantly inflated in my view. It was reasonable, as discussed above, for the Custodian to deduct the full amount of the litigation escrows, which forms a substantial part (if not most) of this putative difference of $65 million.[168] In any

---

[166] Dkt. 1237 at 4 (citing Ginsburg, Levin & Rocap, *Mergers, Acquisitions, and Buyouts*, Chapter 2 (2017); Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders*, Chapter 10 (2015); I.R.S. Priv. Ltr. Rul., 200746004 (Aug. 10, 2007); I.R.S. Priv. Ltr. Rul., 200521007 (Feb. 25, 2005); I.R.S. Priv. Ltr. Rul. 8629038 (Apr. 18, 1986)). This installment sale argument is different from the simplistic argument that was made at the hearing, where Elting's counsel asserted that "it's sort of self-evident [that] you don't get taxed on money that you don't get." Tr. 118 (Jan. 17, 2018).

[167] Dkt. 1237 at 5.

[168] Tr. 122 (Elting's counsel explaining that, of the $65 million, the amount attributable to the decision to deduct the escrows dollar-for-dollar versus the amount attributable to how

event, even if one assumes for the sake of argument a difference of $65 million between the bids as of mid-November, Elting's argument misses a critical point.

When deciding with whom to negotiate in mid-November and when deciding with whom to execute a sale agreement, the Custodian had the express authority and discretion under the Sale Order to take into account more than just price terms. In particular, the Custodian had the authority and discretion to take into account non-economic terms such as the conditionality of a proposal, the likelihood of closing (a matter of great significance to the Company's health), and the maintenance of the business as a going concern—a key aspect of the dual mandate upon which the court afforded Elting relief in the first place.[169] The record reflects that the Custodian carefully considered each of these important factors as he made his decisions, none of which approaches being arbitrary or capricious.[170] In doing so, the final

---

taxes are applied to the amount of the escrow "comes out to about 50-50" or maybe "a little bit more on the tax mistake") (Jan. 17, 2018).

[169] *See* Dkt 848 ¶ 3 ("Any offers from stockholders, as well as any offers from third-party bidders, made pursuant to the established procedures and processes, shall be evaluated by the Custodian, taking into account, among other considerations, price, non-economic terms, generally anticipated U.S. federal income tax consequences to the stockholders from the sale of the Company, likelihood of consummation and other reasonable factors.").

[170] *See* Dkt. 1229 (Pincus Aff. ¶ 13) ("Even if one were to eliminate the $35 million Custodian escrow amount from the HIG offer, the net proceeds, after tax, to the TPG stockholders at closing from the HIG revised final offer of November 15, 2017, compared to the Shawe deal value, would not have been sufficiently material to change my recommendation in support of the SPA, particularly in light of the conditionality and other terms of HIG's proposal at the time I entered into the SPA with Shawe and my evaluation of which proposal best maintains the business as a going concern.").

transaction the Custodian secured with Shawe delivered approximately $40 million more in aggregate after-tax net proceeds than his prior bid with fewer closing conditions and better terms than H.I.G.'s prior bid, all while ensuring that virtually all of the Company's employees would be retained.[171]

### 4. Absence of a Fiduciary Out

Elting next contends that the Custodian "abused his discretion by . . . failing to negotiate a fiduciary out" when entering into the Sale Agreement.[172] In making this argument, Elting relies on a controversial precedent, our Supreme Court's 3-2 decision in *Omnicare, Inc. v. NCS Healthcare, Inc.*[173] The argument is meritless.

To start, unlike in *Omnicare*, the Custodian was not engaged in the sale of a public company, and his actions are not reviewable under traditional fiduciary principles, as discussed above. Rather, the Custodian was negotiating the sale of a private corporation, where fiduciary out provisions are not common.[174] And his

---

[171] Dkt. 1229 (Pincus Aff. Ex. 1) (the aggregate after-tax net proceeds of Shawe's November 15 bid and the final transaction were estimated to be $534.1 million and $574.5 million, respectively).

[172] Objection 40.

[173] 818 A.2d 914, 938 (Del. 2003). Elting also cites a transcript ruling in *In re Complete Genomics S'holder Litig.*, C.A. No. 7888-VCL (Del. Ch. Nov. 27, 2012). That ruling concerned the permissibility of a "Don't Ask, Don't Waive" provision in a standstill agreement in the context of an acquisition of a public company. The court did not discuss *Omnicare* and expressed no view on whether Delaware entities are free to enter into exclusivity provisions without a fiduciary out.

[174] *See* Jessica C. Pearlman, *Private Target Mergers & Acquisitions Deal Point Study*, Am. Bar Ass'n, 48 (2017) (noting absence of fiduciary outs in private target deals); *see also* John C. Coates, IV, *The Powerful and Pervasive Effects of Ownership on M&A*, 24-26

actions are governed by the terms of the Sale Order, including the abuse of discretion standard expressly incorporated therein.

Under the Sale Order, the Custodian had the authority to include in a definitive sale agreement "such provisions as the Custodian, in his sole discretion, deems necessary or appropriate and reasonably customary given the circumstances of this transaction."[175] As noted above, fiduciary out provisions are not reasonably customary in private sale transactions, where it is common to deliver immediate stockholder consent to a transaction. Elting does not contend otherwise.[176] Thus,

---

(June 2, 2010) (comparing public and private targets of M&A deals and finding 85% of public target bids include a fiduciary out, whereas only 10% of private target bids contain a fiduciary out).

[175] Dkt. 848 ¶ 9.

[176] *See* Tr. 137-138 (Jan. 17, 2018) ("[M]any private company sales are sign-and-close deals where a majority or even all of the stockholders affirmatively approve the sale in advance of or even simultaneously with the execution of the agreement. A fiduciary out is obviously unnecessary in that situation."). Even when the sale of a public corporation is at issue, it would be hazardous to construe *Omnicare* as mandating a fiduciary out. As Chief Justice Strine, writing as a Vice Chancellor, explained after *Omnicare* was decided: "it remains the case that Delaware entities are free to enter into binding contracts without a fiduciary out so long as there was no breach of fiduciary duty involved when entering into the contract in the first place." *WaveDivision Hldgs., LLC v. Millennium Digital Media Sys., LLC.*, 2010 WL 3706624, at *17 (Del. Ch. Sept. 17, 2010). Vice Chancellor Laster, who made the ruling in *Complete Genomics* on which Elting also relies, has expressed the same view. *See* J. Travis Laster, *Revlon is a Standard of Review: Why It's True and What It Means*, 19 FORDHAM J. CORP. & FIN. L. 5, at 25 (2013) ("Under *Van Gorkom*, 'Delaware entities are free to enter into binding contracts without a fiduciary out [allowing them to take a better offer] so long as there was no breach of fiduciary duty involved when entering into the contract in the first place.' There is no '*Revlon* duty' that compels a properly informed and motivated board of directors to act otherwise.") (quoting *WaveDivision Hldgs.*, 2010 WL 3706624, at *17).

61

the Sale Order permitted the Custodian to omit a fiduciary out provision if, in his sole discretion, he deemed it necessary or appropriate to do so.

Here, the Custodian has made a compelling case that offering to enter into a definitive sale agreement with no fiduciary out at the end-stage of an extensive sale process was the optimal strategy to obtain the best transaction available consistent with the dual mandate of the Sale Order. The final three bidders from the third round (Blackstone, H.I.G., and Shawe) were put on notice that this was the direction. They each received the Form Sale Agreement, which contained an "exclusivity" provision prohibiting the Company and the Custodian from pursuing any alternative transaction with no fiduciary out.[177] Blackstone, with whom Elting partnered, expanded the exclusivity provision.[178] And the three remaining bidders had been given no indication by the Custodian or any of his advisors that they would have another opportunity to bid after submitting their "final" bids on November 15. To the contrary, H.I.G. had been told that it may not have such an opportunity.[179]

Most significantly, it was evident to the Custodian after the final bids were received that Blackstone was not competitive and that the bids from H.I.G. and

---

[177] Dkt. 1229 (Pincus Aff. ¶ 20).

[178] *Id.*; *see also* Dkt. 1236, Ex. 1 (memo from Elting's counsel to the Custodian summarizing "certain significant issues for [Elting] as a Seller presented in the [Form Sale Agreement]" without mentioning the exclusivity provision).

[179] Dkt. 1229 (Pincus Aff. ¶ 8); Dkt. 1229 (Doolin Aff. ¶ 15).

Shawe reflected only marginal improvement over their previous bids. It was in this context that the Custodian determined, in consultation with his legal advisors and Credit Suisse, that "neither Mr. Shawe nor [H.I.G.] likely would improve substantially their respective bids without being offered a definite opportunity to buy the Company."[180] In other words, it was the Custodian's judgment that the two highest remaining bidders were essentially at a deadlock, that neither of them wanted to serve as a stalking horse, and that the only viable strategy to achieve a significant price move was to deliver the Company to one of them with no fiduciary out— consistent with the exclusivity provision in the Form Sale Agreement that was circulated to them. In my opinion, pursuit of this strategy was entirely sensible and appropriate, and certainly was not an abuse of discretion.

The exclusivity provision in the Sale Agreement prohibits the Custodian from participating in any discussions or negotiations with H.I.G. concerning the bid it submitted on November 22, 2017, after the Sale Agreement had been executed.[181] Given that the final bidders could not have had any legitimate reason to believe that they would be afforded another opportunity to bid after November 15, 2017, and consistent with the rationale for including the exclusivity provision in the Sale

---

[180] Dkt. 1185 (Pincus Ltr. at 40).

[181] Dkt. 1185 (Pincus Ltr. Annex C § 7.9).

Agreement,[182] I view the bid H.I.G. submitted after the gavel had gone down on the auction as irrelevant to deciding whether or not to approve the Custodian's recommendation.

### 5. The Scope of the Releases in the Sale Agreement

Elting's final objection concerns the scope of the releases in Section 8.2 of the Sale Agreement. Section 8.2(a) provides, in relevant part, that:

> Effective upon the Closing, [Elting] and the Custodian, for and on behalf of [Elting] . . . does, to the fullest extent permitted by Law, hereby knowingly and voluntarily waive, fully release and forever discharge and covenant not to sue, directly or indirectly or on behalf of any third Person . . . the Company, the Company Subsidiaries, [PRS Capital LLC], [Shawe], the Debt Financing Sources, the Custodian, his advisors, agents and representatives . . . from [claims] in connection with, arising out of, based upon or related to: (i) [Elting's] employment relationship, or termination thereof, with the Company or any other Seller Released Party; (ii) [Elting's] status as an employee, officer, member, manager, partner, director, or stockholder of the Company or any of its Affiliates; or (iii) any acts, events, facts, matters, transactions, occurrences, statements or representations, or any other matter whatsoever arising out of or related to the Order of the Court, dated March 9, 2015, the Order of the Court, dated August 13, 2015, or the Sale Order and any matters contemplated thereby.[183]

---

[182] *See Omnicare*, 818 A.2d at 942 ("Certainty itself has value. The acquirer may pay a higher price for the target if the acquirer is assured consummation of the transaction.") (Veasey, J., dissenting).

[183] Dkt. 1185 (Pincus Ltr. Annex C § 8.2(a)).

Notably, the Form Sale Agreement that was circulated to the final three bidders contained an essentially identical release, which Blackstone accepted[184] and which Elting did not question when providing comments on the Form Sale Agreement.[185]

Section 8.2(b) of the Sale Agreement contains a reciprocal release in Elting's favor from Shawe (as the Buyer) that tracks subsections (i)-(iii) of Section 8.2(a), but carves out the claims asserted in seven pending lawsuits. Six of those lawsuits involve claims Shawe and/or his mother filed against Elting, Elting's New York counsel, one of Elting's financial advisors, Elting's husband and his employer, and Elting's Delaware counsel, referenced above. The seventh lawsuit is one Elting filed in New York in 2014, seeking to remove Shawe as a director and officer of the main operating subsidiary of TransPerfect.[186] I refer to these seven actions collectively as the "Buyer Excluded Claims."

The Sale Order specifically authorizes the Custodian to deliver a release on behalf of any of the Company's stockholders in connection with executing a definitive sale agreement:

> The Custodian is authorized to execute and deliver (or cause to be executed and delivered) on behalf of the Company and its stockholders (i) a definitive sale agreement . . . with such provisions as the Custodian,

---

[184] Dkt. 1229 (Pincus Aff. ¶ 20); Dkt. 1242 (Ex. 1 § 8.2).

[185] *See* Dkt. 1236, Ex. 1 (memo from Elting's counsel to the Custodian summarizing "certain significant issues for Elizabeth Elting . . . as a Seller presented in [the Form Sale Agreement]").

[186] *Elting v. Shawe, et al.*, No. 651423 (Sup. Ct. N.Y. Cty. 2014).

in his sole discretion, deems necessary or appropriate and reasonably customary given the circumstances of this transaction, *including*, without limitation, . . . *waiver of claim provisions*.[187]

No authority has been brought to the court's attention concerning what form of release would be "reasonably customary" in a court-ordered sale process under 8 *Del. C.* § 226. One authority the court found comes from *Supreme Oil*, where the court appointed a custodian under 8 *Del. C.* § 226 to sell a company that had a deadlocked board.[188] The custodian in *Supreme Oil* executed a merger agreement on behalf of the stockholders that included a release of all claims each of the stockholders "has or may have against," among others, "the Acquired Companies, the Buyer, Merger Sub, the Custodian, [and the Custodian's law firm] . . . in connection with the Stockholder's ownership of the Shares or in connection with the Merger."[189] Similar to the release in Section 8.2(a) of the Sale Agreement here, the release in *Supreme Oil* appears intended to put to rest any claims of stockholders arising out of their ownership of shares of the acquired company and the sale process that led to the acquisition of those shares.

As I understand it, Elting's objection concerning the releases in the Sale Agreement has two components. First, Elting objects to the release of her claim

---

[187] Dkt. 848 ¶ 9 (emphasis added).

[188] 2015 WL 2455952, at *2.

[189] Dkt. 161 (C.A. 10618-VCL), Ex. 1 § 9.14.

66

against Shawe for allegedly undermining the sale process, in particular the claim she asserted against Shawe in a new action filed on December 21, 2017.[190] Second, Elting objects to the carve-out for the Buyer Excluded Claims in the reciprocal release from Shawe in Section 8.2(b) of the Sale Agreement.

With respect to the first issue, it makes perfect sense that claims relating to one's ownership of shares in a corporation that is subject to a court-ordered sale process and claims relating to the sale process itself would be released upon consummation of a sale. If that were not the case, a selling stockholder would get two bites at the apple in establishing the consideration for her shares—one from the sale process itself and the second in the form of an option to re-litigate the sale process.[191] That makes no sense. The whole point of a court-ordered sale process is to effectuate a business divorce by determining the amount of consideration to be paid for the shares of a selling stockholder, *period*, and to put to rest the disputes between the former business partners that necessitated the sale in the first place. Relatedly, it is hard to imagine that any buyer in a court-ordered sale process would accept the "two bites at the apple" approach Elting advocates, as the release in *Supreme Oil* demonstrates.

---

[190] Dkt. 1 (C.A. 2017-907).

[191] Apart from being illogical, Elting's position is inequitable given that she had every opportunity to seek relief during the sale process if she truly believed the process was so flawed as a result of Shawe's conduct to warrant court intervention. It was incumbent on Elting, however, to seek such relief in a timely fashion.

Here, given the extensive amount of litigation surrounding the sale process, the need for a release of claims concerning the sale process is all the more evident. "In the Custodian's judgment, without such releases, no bidder would pay hundreds of millions of dollars in these circumstances, and consummation of a sale would be infeasible."[192] I agree with this assessment and find that the Custodian plainly did not abuse his discretion in agreeing on Elting's behalf to the release in Section 8.2(a) of the Sale Agreement that would put to rest claims relating to the sale process.

With respect to the second issue, I appreciate Elting's frustration that the seven cases defined as the "Buyer Excluded Claims" do not go away automatically upon consummation of the sale. Although most of these cases were filed as an apparent response by Shawe to the court's decision to undertake a sale process, they do not relate to the sale process itself and thus are qualitatively different from the case Elting recently filed in this court. These cases, moreover, involve other parties and issues that complicate their resolution.

To be more specific, several of the Buyer Excluded Claims involve claims or issues outside of Shawe's control. For example, one case involves claims Elting filed against Shawe in 2014 that are within her control. Another case (a tort action arising out of an alleged kicking incident) includes a counterclaim Elting filed. In a third case, the only open issue is defendants' application for fees that was granted as

---

[192] Dkt. 1229 at 33.

68

a sanction against Shawe.[193]  Elting is not even named as a party to three of the seven cases, two of which (along with a third case in which Elting was named as party) were dismissed in June 2017 with a stern warning from the trial court judge.[194]

Importantly, the Sale Agreement contains a covenant requiring Shawe and his mother to use reasonable best efforts to settle the Buyer Excluded Claims without the payment of any compensation:

> [Shawe] and Shirley Shawe hereby agree that they . . . shall use reasonable best efforts to obtain a mutual settlement, without the exchange of monetary consideration, of the pending Litigations listed in Section 8.2(b) of the Disclosure Letter [the Buyer Excluded Claims], and to obtain a mutual release of all future Litigation between [Shawe], [Elting] and their respective advisors, agents and representatives relating to any event occurring prior to the Closing.[195]

Given the idiosyncratic issues entailed in resolving the Buyer Excluded Claims and the inclusion of the foregoing covenant in the Sale Agreement, it was not an abuse

---

[193] In the action filed against Delaware counsel, the district court dismissed the case *sua sponte* and granted defendants' motion for sanctions after concluding that the case "was brought in bad faith" and was "frivolous" based on its finding that "Shawe's purpose in presenting the Court with the complaint and the amended complaint was to harass the Defendants and to abuse the court system." *Shawe v. Potter Anderson & Corroon LLP*, 2017 WL 6397342, at *4-5.

[194] In dismissing actions brought against Elting's New York counsel, financial advisor, and her husband and his employer, the court stated: "given the borderline frivolity of these lawsuits, Philip and Shirley Shawe are cautioned that the maintenance of future suits in this court that are barred by the outcome of the Delaware action may result in sanctions and a filing injunction." *Shawe v. Elting*, Nos. 153375, 652482, 652664, 2017 WL 2882221, at *28-29 (Sup. Ct. N.Y. Cty. 2016).

[195] Dkt. 1185 (Pincus Ltr. Annex C § 8.2(d)).

of discretion for the Custodian to agree to the carve-out for the Buyer Excluded Claims in the Section 8.2(b) of the Sale Agreement.

*****

Paragraph 18(d) of the Sale Order provides that the court "shall approve the Agreements, and the consummation of the transactions contemplated therein . . . unless the objecting party shows an abuse of discretion by the Custodian in connection with the sale process or the terms of the Agreements." For the reasons explained above, Elting has not shown that the Custodian abused his discretion in connection with the sale process or the terms of the Sale Agreement. Accordingly, the court accepts the Custodian's recommendation and hereby approves the Sale Agreement.

## IV. CONCLUSION

For the reasons explained, the court will enter the implementing order the Custodian submitted approving the Sale Agreement.[196]

**IT IS SO ORDERED.**

---

[196] The implementing order notes that Civil Action Nos. 9661 and 9686 "previously were resolved by the Court and are no longer pending or ongoing matters, with the final determinations of the Court in those Civil Actions no longer subject to appeal or disturbance." Dkt. 1185 (Proposed Order at 6). Accordingly, those actions will be closed.